Paul Joseph **RILEY**, Appellant,

v.

**DISTRICT OF COLUMBIA**, Appellee.

Allen Mark **SILBERGELD**,* Appellant,

v.

**DISTRICT OF COLUMBIA**, Appellee.

Nos. 5601, 5602.

District of Columbia Court of Appeals.

Argued April 19, 1971.

Decided Nov. 24, 1971.

---

* The correct spelling of appellant Silbergeld's name is Alan Mark Silbergeld.

Landon G. Dowdey, Washington, D. C., with whom Roark M. Reed, Washington, D. C., was on the brief, for appellants.

Ted D. Kuemmerling, Asst. Corp. Counsel, with whom C. Francis Murphy, Corp. Counsel, and Richard W. Barton, Asst. Corp. Counsel, were on the brief, for appellee.

Before KELLY, FICKLING and REILLY, Associate Judges.

KELLY, Associate Judge:

These appeals are from convictions of disturbing a religious congregation in violation of D.C.Code 1967, § 22–1114.[1]

Anticipating from prior publicity the attendance at Mass of members of the Center for Christian Renewal, and being aware of allegedly disruptive actions previously taken by that group at St. Matthew's Cathedral, the pastor of the Shrine of the Most Blessed Sacrament, a Roman Catholic church in this city, with the advice of the parish council prepared a statement to be read at Mass should members of the group appear. On Sunday, August 10, 1969, at the 12:55 Mass, there was occasion for the lector to read the prepared statement which informed the congregation, in substance, that a disturbance similar to those that had recently occurred in other churches in the diocese was expected; that to create a disturbance during the course of a religious service was a misdemeanor; that no such disturbance would be tolerated, and that creation of such disturbance by doing certain acts, including distributing printed materials, would result in prompt arrest.[2]

1. § 22–1114. Disturbing religious congregation.

It shall not be lawful for any person or persons to molest or disturb any congregation engaged in any religious exercise or proceedings in any church or place of worship in the District of Columbia; and it shall be lawful for any of the authorities of said churches to arrest or cause to be arrested any person or persons so offending, and take him, her, or them to the nearest police station, to be there held for trial; and any person or persons violating the provisions of this section shall forfeit and pay a fine of not more than one hundred dollars for every such offense.

2. The statement read:
"We are sorry to have to inform the congregation that members of the group which has been causing the disturbances during and following Mass at St. Matthew's Cathedral in recent weeks have assembled here this morning. Some may already be seated in the pews among you.
"They were advised outside that the law of the District of Columbia makes it a

Later in the Mass, during the offertory, appellants rose and followed the ushers taking the collection down the aisles, handing out leaflets [3] to the first person in each pew to be passed along to others. The celebrant of the Mass went immediately to the lectern, announced to the congregation that the anticipated disturbance was taking place, and asked appellants to cease the distribution of literature and leave. In apparent defiance of this request, appellants continued their distribution of material for a period of about twenty seconds, then departed the church. Outside, at the request of the pastor, appellants were arrested by waiting police officers.

It was the finding of the trial court, from conflicting evidence, that despite the request to remain calm a number of parishioners were upset by the incident, one woman exclaiming "Call the police * * * arrest these men"; one man being fearful that someone would strike appellants; [4] the celebrant becoming so agitated that he could not hold his hands in a position of prayer, and the pastor being particularly disturbed by "the frenzied activity what with the [appellants] throwing things into each pew and the people throwing them back and by the fact that the Mass was stopped (interrupted)." Other parishioners were unable to pray or to concentrate on their prayers.

The court also found that "[t]he Mass as normally and customarily celebrated at Blessed Sacrament does not provide for nor authorize persons to leave the pews and follow the ushers during the collection of money gifts from the congregation, nor during that time to distribute literature in derogation of the decision of the parish council and the pastor of the church."

The court's initial conclusion of law disclaimed any attempt to evaluate or define appellants' rights, as Catholics, to distribute leaflets during the Mass for the stated reason that it could not adjudicate disputes over religious principles or procedures.[5] It then proceeded to rule that there was proof beyond a reasonable doubt that appellants had disturbed a religious service within the meaning of § 22–1114, D.C.Code 1967.[6] Finally, citing United States v. Brooks, 4 D.C. (Cranch) 427 (1834), the trial court held that rather than violating

misdemeanor to create a disturbance during the course of a religious service; that any person engaging in such a disturbance is subject to arrest; that creation of a disturbance in this church during any Mass or service—by deliberately standing at an improper time, by addressing the congregation, moving about or occupying the aisles, by distributing printed materials, or by any other disruptive action will meet with prompt arrest. The police have been advised of the possibility of disturbances and are present. We sincerely hope that the leaders of the assembled group will heed this warning and that there will be no disturbance. Should one actually occur, we will regretfully ask that appropriate arrests be made. Every effort will be made to do this quietly and with a minimum of disruption to the Mass. Again, we hope this will not be necessary; but, should it be, we ask our parishioners and ushers to remain quietly in your places without becoming involved. We know you all share our desire that no disturbances will take place." (R. 36–37.)

3. The text of the leaflet accused the members and clergy of the parish of following "racist policies".

4. The record reflects that on one occasion at St. Matthew's Cathedral a member of the Center was "slugged on his way to Communion."

5. See, e. g., Presbyterian Church in United States v. Mary Elizabeth Blue Memorial Presbyterian Church, 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969); Kreshik v. St. Nicholas Cathedral, 363 U.S. 190, 80 S.Ct. 1037, 4 L.Ed.2d 1140 (1960); Kedroff v. St. Nicholas Cathedral, 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120 (1952); Gonzalez v. Roman Catholic Archbishop, 280 U.S. 1, 50 S.Ct. 5, 74 L.Ed. 131 (1929).

6. Counsel for appellants conceded in closing argument that there had been a disturbance of a religious service, but argued that whatever disturbance had occurred resulted from the reading of the statement by the lector rather than by appellants' behavior.

the "establishment" clause of the First Amendment, as appellants alleged,\ § 22–1114 enforces the "free exercise" clause of the Amendment, /it\ being a codification of the common law which similarly prohibited disturbance of divine service.)

Appellants contend that § 22–1114 is unconstitutionally vague for failure to specify the kinds of conduct prohibited at a religious service or to set standards as to the type of conduct which would amount to an illegal disturbance. However, in our judgment, which accords with similar holdings,[7] "disturb" is a word in common use and has an ordinary meaning which is easily understood by persons of reasonable intelligence. By definition, it is a word which means, *inter alia*,[8]

> to throw into confusion or disorder; to interfere with (as by hindering or causing to turn from a course or to stop); to interfere with in the lawful enjoyment of a right; to destroy the rest, tranquillity or settled state of; to upset the mental or emotional composure of.

▆▆▆▆ To be sure, the question of whether or not a person's activities may be said to disturb a meeting or assembly depends to a large extent upon the type of meeting which is supposedly disturbed. For example, acceptable conduct at a basketball game[9] or a political rally[10] is not commonly the sort of behavior which is ac-

ceptable, or expected, at a church service, or even in the reading room of a public library. Nevertheless, the fact that the term "disturb" may not be capable of precise definition does not of necessity mean that § 22–1114 violates the due process standard of vagueness.[11] A reasonable degree of certainty is all that is required, Boyce Motor Lines, Inc. v. United States, 342 U.S. 337, 72 S.Ct. 329, 96 L.Ed. 367 (1952), and it is our opinion that the wording of this statute meets that test.

There appears to have been no interpretation of § 22–1114 by any court in this jurisdiction since its enactment. However, similar statutes prohibiting disturbances of assemblies or meetings, religious[12] or otherwise,[13] have been the subject of judicial consideration. In one, State v. Olson, 287 Minn. 300, 178 N.W.2d 230 (1970), the defendant was convicted of violating a statute proscribing conduct disturbing to the peace and quiet of others. Olson, who was not of the Roman Catholic faith but was in the company of a Catholic from another parish, remained standing while the canon of the Mass was in progress, with the congregation kneeling in prayer, and criticized the celebrant of the Mass in a loud and angry tone. The court's holding was that

> [g]ranting defendant's claim that his actions were motivated by a concern for

---

7. *See, e.g.*, State v. Davis, 21 Ohio App.2d 261, 257 N.E.2d 79 (1969) (disturbing graduation ceremonies) ; State v. Wiggins, 272 N.C. 147, 158 S.E.2d 37 (1967), cert. denied, sub nom. Wiggins v. North Carolina, 390 U.S. 1028, 88 S.Ct. 1418, 20 L.Ed.2d 285 (1968) (disturbance of school by protesting) ; State v. Smith, 46 N.J. 510, 218 A.2d 147, cert. denied, sub nom. Smith v. New Jersey, 385 U.S. 838, 87 S.Ct. 85, 17 L.Ed.2d 71 (1966) (disturbing city council meeting) ; State v. McNair, 178 Neb. 763, 135 N.W.2d 463 (1965) (disturbing city council meeting).

8. Webster's Third New International Dictionary.

9. State v. Morgulis, 110 N.J.Super. 454, 266 A.2d 136 (1970).

10. In re Kay, 1 Cal.3d 930, 83 Cal.Rptr. 686, 464 P.2d 142 (1970).

11. State v. Smith, *supra* note 7.

12. *See, e. g.*, Jones v. State, 219 Ga. 848, 136 S.E.2d 358, cert. denied, sub nom. Jones v. Georgia, 379 U.S. 935, 85 S.Ct. 330, 3 L.Ed.2d 345 (1964) (disturbing divine worship by loud talking, shouting and sitting on the floor of church) ; Ford v. State, 210 Tenn. 105, 355 S.W.2d 102 (1962), cert. denied sub nom. Ford v. Tennessee, 377 U.S. 994, 84 S.Ct. 1901, 12 L.Ed.2d 1046 (1964) (disturbing a religious assembly).

13. State v. Besson, 110 N.J.Super. 528, 266 A.2d 175 (1970) (disturbing school assembly) ; State v. Davis, *supra* note 7 ; State v. Wiggins, *supra* note 7 ; State v. Smith, *supra* note 7 ; State v. McNair, *supra* note 7.

the truth as he conceives the truth to be, we believe that one who invites himself to a private place of worship such as a church or synagogue in order to contest the teachings of its pastor, minister, or rabbi, in the presence of a congregation engaged in formal religious worship, should inform himself before doing so whether and when such a disputation would be considered less than offensive. * * * A stranger who imposes himself upon a congregation in a situation such as this in a way which gives the appearance of an intentional obstruction of religious meditation by insulting remarks and bizarre behavior has exceeded the permissible limits of free speech and has infringed upon the rights of others to worship according to the dictates of their conscience. Conceding that criminal sanctions may be of limited help in curbing such indiscretions, we do not believe the State or Federal Constitutions prohibit their use in situations of this kind when public authorities consider it advisable to resort to them. [178 N.W. 2d at 232–233.]

Admitting that it was inappropriate for him to make his protest during the canon of the Mass, Olson had taken the position that it would have been permissible for him to interrupt the services at a more appropriate, unspecified time without exception being taken to his conduct, and that he should not be punished for an error in timing. While the opinion does not so state, in all probability Olson was relying on Gaddis v. State, 105 Neb. 303, 180 N.W. 590, 12 A.L.R. 648 (1920), to support this contention. In *Gaddis*, the defendant had interrupted a sermon to correct a statement the minister had made and then, asking permission to speak, had proceeded to address the congregation. No audible objection was made when Gaddis requested that

he be allowed to speak except for an impromptu musical service rendered by the choir. In reversing Gaddis' conviction for interrupting a meeting of a religious society, the court said:

It is manifest from undisputed evidence that defendant interrupted a religious meeting, but it is not every interruption that constitutes a violation of law. Without violating the statute forbidding the interruption of a religious meeting, members of the society may repel a lawless invasion either from without or from within. Under the same principle, a member of a religious society, if permitted by its precepts and usages, may, in a becoming manner with good motives, interrupt a minister to correct utterances at variance with established tenets or rites. Otherwise freedom of worship and free speech might be impaired by bigotry and false doctrines. The proper and orderly exercise of these rights, though resulting in a commotion during a religious meeting, is not punishable in a criminal court. * * * [180 N.W. at 591, 12 A.L.R. at 649–650.]

We would agree that not every interruption of a religious service constitutes a violation of law. Certainly, to justify the imposition of criminal sanctions for disturbing a religious meeting a person must have intentionally committed an act or acts which are found to have substantially disrupted the service. A conviction cannot be had for conduct which is orderly and within the known customs and usages governing the religious exercise or proceedings in the church.[14] On the other hand, violence of conduct is not a prerequisite for conviction of disturbing a religious meeting.[15]

A trivial incident, even if explicitly forbidden, could not be the basis of a

---

14. State v. Olson, 287 Minn. 300, 178 N.W.2d 230 (1970) ; Gaddis v. State, 105 Neb. 303, 180 N.W. 590, 12 A.L.R. 648 (1920) ; *cf.* In re Kay, *supra* note 10.

15. The trial court also held that breach of the peace is not an element of the mis-

demeanor charged here, but if it were, it would have no difficulty in concluding that there was in fact a breach of the peace. *See* Ford v. State, 210 Tenn. 105, 355 S.W.2d 102 (1962), cert. denied, sub nom. Ford v. Tennessee, 377 U.S.

conviction under § 22-1114.[16] Here, however, the convictions are based upon the cumulative effect of appellants' actions[17] upon members of the congregation and of the clergy by disobeying a specific directive of the pastor and distributing literature during the offertory, in a precipitous manner, contrary to the customs and usages of the Blessed Sacrament Church, causing prayers to be interrupted and the Mass to be halted. The trial court believed there was a substantial disturbance of a religious meeting and, while there was evidence to the contrary, we conclude that its findings of fact have support in the evidence sufficient to preclude a holding that they are erroneous as a matter of law. These findings, in turn, support the finding of guilt beyond a reasonable doubt.

■ Appellants cite us to cases explicating the right to peacefully engage in First Amendment activities and the prohibition of convictions based upon the reaction of others to those activities. Gregory v. City of Chicago, 394 U.S. 111, 89 S.Ct. 946, 22 L.Ed.2d 134 (1969); Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963); Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). However, it was not the views expressed in the literature appellants were distributing which disturbed the congregation; rather it was the manner in which the literature was distributed, in defiance of church custom and direction, and the halting of the Mass, however briefly, which was disturbing. Furthermore, it is clear that one may not exercise claimed First Amendment rights at any place or at any time, Adderley v. Florida, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966), reh. denied, 385 U.S. 1020, 87 S.Ct. 698, 17 L.Ed.2d 559 (1967); Cox v. Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 1471

(1966), nor do so at the expense of the constitutional rights of another. As the late Mr. Justice Black, speaking of the distribution of literature in the exercise of those rights, said in Martin v. Struthers, 319 U.S. 141, 143, 63 S.Ct. 862, 863, 87 L.Ed. 1313 (1943):

> The authors of the First Amendment knew that novel and unconventional ideas might disturb the complacent, but they chose to encourage a freedom which they believed essential if vigorous enlightenment was ever to triumph over slothful ignorance. This freedom embraces the right to distribute literature, Lovell v. Griffin, 303 U.S. 444, 452, 58 S.Ct. 666, 669, 82 L.Ed. 949 [954], and necessarily protects the right to receive it. The privilege may not be withdrawn even if it creates the minor nuisance for a community of cleaning litter from its streets. Schneider v. State, 308 U.S. 147, 162, 60 S.Ct. 146, 151, 84 L.Ed. 155 [165]. Yet the peace, good order, and comfort of the community may imperatively require regulation of the time, place and manner of distribution. Cantwell v. Connecticut, 310 U.S. 296, 304, 60 S.Ct. 900, 903, 84 L.Ed. 1213 [1218], 128 A.L.R. 1352. No one supposes, for example, that a city need permit a man with a communicable disease to distribute leaflets on the street or to homes, or *that the First Amendment prohibits a state from preventing the distribution of leaflets in a church against the will of the church authorities.* [Footnote omitted.] [Emphasis supplied.]

■ Finally, we reject appellants' contention that their convictions resulted from an impermissible intrusion into a dispute among members of a church congregation over a purely religious matter. The trial court did not attempt to decide an ec-

---

994, 84 S.Ct. 1901, 12 L.Ed.2d 1046 (1964). Appellants do not pursue the point on appeal.

16. For instance, a prosecution of appellants for disturbing a religious congregation "by standing at an improper time", one mode of conduct proscribed by the

statement which the lector read to the congregation.

17. Contrary to appellant Riley's contention, there is sufficient evidence of record to permit a finding that he engaged in distribution of literature at the Mass and indeed, it was so stipulated at trial.

clesiastical question nor to enforce religious conformity, as appellants would have us believe. It did not receive the testimony as to the customs and usages of Blessed Sacrament Church in order to interpret canon law or liturgical practice but solely as an aid in determining whether or not appellants had violated a criminal statute; a statute which it correctly held was a guarantee of the free exercise of religion to all persons.

In summary, we hold that a legitimate governmental interest in protecting freedom of worship as well as the maintenance of peace and good order in the community underlies § 22–1114 of the D.C.Code, prohibiting disturbances of religious meetings. We hold, further, that § 22–1114 does not impinge upon First Amendment freedoms, nor is it unconstitutionally vague or overbroad on its face or, under our construction of the statute, as applied here.

Accordingly, the convictions are

Affirmed.