Abdul R. DARAB, et al., Appellants,

v.

UNITED STATES, Appellee.

Nos. 85–CM–128, 85–CM–151.

District of Columbia Court of Appeals.

Argued Oct. 2, 1992.
Decided April 9, 1993.
As Amended April 9, 1993.

**128**

Lee H. Karlin, Washington, DC, appointed by this court, for appellants.

Valinda Jones, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher, and Roy W. McLeese, III, and Thomas J. Motley, Asst. U.S. Attys., Washington, DC, were on the brief, for appellee.

Before ROGERS, Chief Judge, and TERRY and SULLIVAN, Associate Judges.

ROGERS, Chief Judge:

These twenty-four appeals arise from appellants[1] convictions by a jury of unlawful entry, D.C.Code § 22–3102 (Repl.1989), at the Islamic Center located at 2551 Massachusetts Avenue, N.W., Washington, D.C., on July 11, 1983. On appeal appellants contend that their convictions violated the Free Exercise and Establishment Clauses of the First Amendment. They also contend that the trial judge abused his discretion by replacing a regular juror with an alternate, and by denying a new trial based on misconduct of the courtroom clerk. The law controlling the constitutional claim raised by appellants is settled, and they cannot prevail. We find no abuse of discretion by the trial judge in replacing the regular juror. Although we are troubled by the unprofessional conduct of the courtroom clerk, we find no abuse of discretion by the trial judge in denying the motion for a new trial. Accordingly, we affirm.[2]

## I.

The Islamic Center is owned and operated by an organization incorporated as the Islamic Center.[3] In November 1982, the Board of Governors named Dr. Samuel Hamoud the administrator and program planner of the Islamic Center. In his capacity as administrator, Dr. Hamoud was responsible primarily for secular matters

1. Appellants are Abdul R. Darab, Mohammad Asi, Mahir M. Saifullah, Haneefah Kareem, Ali A. Mohammadi, Naghmeh Djahanyekta, Nasser Asi, Nader Rad, Jebreel Jabbar, Anthony Mohammad, Salahuddeen Kareem, Ibrahim M. Ibrahim, Abdullah Darab, Mohammad Lotfalikhanzand, Hossein Geramifar, Paul W. Henderson, Nathaniel Coleburn, Hassan J. Paterrov, Abolghasem Jamshidi, George V. Huger, Hossain Morakkabi, Mark D. Smith, Bahram Nahidian, and Ahmed Alwazir.

2. The court expresses appreciation to appellant's counsel for filing a supplemental brief regarding the timeliness of these appeals. By refer-

ring to trial court orders of November 23, 1984, and January 7, 1985, we conclude that these appeals were timely filed.

3. The association was originally incorporated as the Washington Mosque Foundation, but its name was later changed to the Islamic Center. At trial, the government introduced the articles of incorporation of the Islamic Center and the deed. The corporate structure of the Islamic Center consists of a Board of Governors comprised of ambassadors of Muslim countries as well as an Executive Committee, which is responsible for the daily operations of the Center.

involving the Center, including daily operations and security.

July 11, 1983, was significant to the Islamic Center for two reasons. First, a service was scheduled to celebrate a major Islamic holiday, the Eid Al–Fitr or the Feast of the Breaking of the Fast following Ramadan. In addition, it was the first day that the Mosque was open to the public following a three to four month renovation period. The Board of Governors of the Center had announced, in a newspaper advertisement, the reopening of the Mosque and invited Muslims to join in the Eid prayer to be held on July 11th. Dr. Hamoud testified that the Center was expecting 1,500 to 3,000 people; the capacity of the Mosque was only 850 to 1,000 people.

The disturbance at issue arose from a schism within the Muslim community. According to the testimony of appellants Mohammed Asi and Tariq Khan, for several years members of the Muslim community in the Washington metropolitan area were displeased with the appointed leadership at the Center and wanted to have a greater role in its administration. An election was held on November 11, 1981, to choose a Counsel of Guidance and an Imam, who serves as the religious leader for the congregation. Approximately 400 to 500 members voted, and appellant Asi was chosen by 250 votes· to be Imam. From the time of his election through March of 1983, appellant Asi delivered the Friday sermons at the Center. On March 5, 1983, however, Asi was evicted from his apartment in the Islamic Center and the Center was closed. Nevertheless, Muslims continued attending services led by Asi outside the Center. This set the stage for the reopening of the Mosque at the celebration of the Eid on July 11, 1983.

The administrator of the Center, Dr. Hamoud, made special security arrangements for the event. He hired ushers to help seat people, H & H investigators (a private security company under contract with the Center since it had closed in March of 1983), and fourteen additional private security officers. Dr. Hamoud testified that he had made these special arrangements for two main reasons. First, he was concerned about the size of the crowd expected in view of the coincidence of the reopening and the holiday. Secondly, he anticipated that a confrontation might occur between those leading the service conducted by the appointed Imam and the dissatisfied segment of the Muslim community led by Imam Asi.[4] He based his concern on a newsletter circulated by the dissatisfied group which stated that only Mohammed Asi would lead the prayer.[5]

4. The defense introduced into evidence a letter on Islamic Center stationery in Dr. Hamoud's handwriting dated July 10, 1983, one day before the incident at issue. It read:

H.G. and H & H to be displayed to help keep the crowd under control and provide security. Tone of the meeting optimistic by some, but my own sense is that from this ... 1983 newsletter and from verbal threats I've been getting month, that they'll do as Asi's brother-in-law says. They'll try to take it back.
And Nahidian keeps saying the same thing that there are more threats [sic] week. Let's hope for the best. We have also asked MPD to keep a low profile so we can solve this problem so all of us Muslims can be together in peace not fighting together.
Many ambassadors are as optimistic as they were the day we reclaimed the Center in March. I hope they're right this time, but I'm more realistically pessimistic. But let's pray for peace and the best.

5. The newsletter read:

The Saudian ambassadors' advertisement (Board of Governors) has highly influenced, if not manipulated by this arrogant character in the Washington Post, 1983 issue, special arrangement which the ad talks about is no more than a ploy to create a "lawful" avenue for the Board of Governors to have the kufar participate in their plot against the Muslims. Remember individuals such as Hassan–Bey Sadiq and Hamoud and others scheduled to appear in court against Muslims for opposing the closure of the mosque. The opening of the mosque on ... [the Eid] is to take the Muslims and register their reactions. The wise do not follow into their plots.
Following the directions of the marshals appointed to the Council of Guidance who will insure that everything runs orderly as possible and elected Imam of our community, be firm in your faith and move not from that path. Surely victory is with us. No one other than Mohammed will lead Salat and hutspa. —Imam regardless of where he comes from is unacceptable to us to reject as pawns and those who use them as pawns.

On July 11, 1983, the Islamic Center opened at 7:00 a.m. for the ritual chanting. The Center's appointed Imam, Dr. Al–Aseer,[6] testified regarding the format of the Eid ceremony. He explained that the ritual chanting, or the "takbiraat," is supposed to stop once the Imam issues the order for the person in charge to give a prelude to the prayer. The prelude normally takes one to three minutes, at which point the worshipers rise and the Imam begins the prayer, which is in two parts. The first prayer begins with the takbiraat, which is repeated seven times, followed by a recitation from the Koran. The second unit of prayer involves a similar sequence. According to Dr. Hamoud, the chanting was scheduled to begin at 7:00 a.m. followed by the prayer at 8:00 a.m.

Dr. Al–Aseer arrived at the Center between 7:30 and 8:00 a.m. in order to lead the prayer and deliver the sermon.[7] He went into the Mosque and shared the takbiraat with the Muslims present who were already performing the ritual chanting. A few minutes after 8:00 a.m. he signaled to the officer in the Mosque to begin the prelude. According to Dr. Al–Aseer, as that person stood up to deliver the prelude, someone moved toward him and took the microphone, another person sat in the mihrab, and a third person sat on the mimbar.[8] The person who took the microphone then led a chant of takbeer, in which approximately fifty people joined. At some point after that, Dr. Al–Aseer was hit and his turban was knocked to the floor. As he moved to pick up his turban, he saw two worshipers fighting with someone close to him. He left the Mosque and returned later, at 10:00 a.m., to lead a second ceremony.

Dr. Hamoud testified that when he first entered the mosque that morning it was "jammed with people like sardines." Shortly after 8:00 a.m., he was standing in the courtyard when he heard people yelling that fighting was taking place inside the Center. Upon entering the Mosque for a second time, he heard the shouting and observed an unauthorized man sitting on the mimbar with a microphone in his hand. Dr. Hamoud approached that person and asked twice for the microphone. The man refused and continued chanting. When Dr. Hamoud held out his hand for the microphone, the man swung the microphone at him, hitting him in the arm. Dr. Hamoud then grabbed the man with his left hand and felt himself being pushed by others. He also noticed that two Muslim worshipers were defending the appointed Imam and that "[t]here were blows being struck." As he continued to push, Dr. Hamoud was knocked to the ground, and he observed more fighting and arguing. He was unable to stand up, despite several efforts to do so, because he was being hit and kicked.[9] He crawled toward the back of the Mosque and ran out in order to call the police.

As he ran out of the Mosque, Dr. Hamoud saw Sadiq Hassan–Bey of H & H Security and requested that he go in and attempt to quiet the disturbance. Hassan–Bey testified that when he went to the front door of the Mosque, he saw "[b]asically pandemonium. I saw individuals at the rear of the mosque being involved in some type of multiple struggles. I observed an individual sitting on what is

6. The Board of Governors of the Center, which also chooses the Imam, appointed Dr. Adil Al–Aseer as the new Imam. July 11, 1983, was to be his first opportunity to lead the prayer as the new Imam.

7. Dr. Al–Aseer explained that the service consists of both the prayer and the sermon. Once the prayer has been completed, the Imam proceeds to the mimbar, where he delivers the sermon.

8. The mimbar is a Muslim pulpit. The mihrab is the area in the mosque which identifies which direction the Muslims are to pray and also serves as the traditional seating place for the Imam prior to the start of religious services.

9. Special Police Officer David Merrill Diggs II, an employee of Honor Guard who had been assigned to assist H & H Security, corroborated this part of Dr. Hamoud's testimony, stating that he saw him receive several blows to the back of his head and body. Diggs also testified that earlier he had heard people hollering in the mosque as to who were the good Muslims and heard some say "we're going to take the Mosque back."

known as the mimbar. I observed others individuals involved in shouting matches." According to Dr. Hamoud, Hassan–Bey responded that police assistance was needed, and Dr. Hamoud approached Lieutenant Parker of the Metropolitan Police Department, who was standing outside the gates of the Center. Dr. Hamoud asked Lieutenant Parker to take his officers into the mosque and break up the disturbance. After Lieutenant Parker radioed for assistance [10], Dr. Hamoud conferred again with Hassan–Bey in the courtyard in order to assess the situation. According to Dr. Hamoud, Hassan–Bey informed him that they had to keep the situation under control until the rest of the police officers arrived.[11]

In arriving at a decision on how to handle the situation, Dr. Hamoud consulted with various sources. In addition to discussing the matter with Hassan–Bey, Dr. Hamoud had a conversation with Deputy Chief Connors and Lieutenant Parker about how to handle the situation. He concluded that the police and security officers would have to clear the Mosque and that the service would be restarted later.[12] Dr. Hamoud testified that this was his decision to make because the Board of Governors had given him "the authority to run the security operation, and if necessary, to have people evicted from the [M]osque...." [13]

Upon making the decision to have the Mosque cleared, Dr. Hamoud instructed Hassan–Bey to go into the Mosque and warn those inside that if they did not leave peacefully, arrests would have to be made.[14] Hassan–Bey testified that he gave the warnings in a "clear and distinct" voice at around 9:00 a.m., and that he specifically warned appellant Al Asi to have his people leave or they would be arrested. Dr. Hamoud, from about thirty feet away, heard Hassan–Bey give the warnings and recite the Code provisions over the bullhorn. Lieutenant Parker also heard the warnings from fifteen feet away.[15] Special Police Officer Diggs testified that after he heard the warnings, the people inside the Mosque continued chanting and locked arms. After three warnings had been issued by Hassan–Bey, and no one left the Mosque, Dr. Hamoud asked the police to enter the Mosque and assist with the arrests.[16]

10. Lieutenant Parker reported to his superiors that he had "observed that there was a group of individuals who were disrupting the service that had been going on.... [T]here was a lot of noise there, there was screaming. Well, yelling, and people being very boisterous." After talking to Dr. Hamoud, "it was decided that ... the religious service had been disturbed."

11. Hassan–Bey testified that while they waited for police assistance to arrive, he went back into the Mosque and witnessed "a group of people, some pulling, some pushing a security officer, some swinging at him."

12. According to Lieutenant Parker's testimony, he, Deputy Chief Connors, Dr. Hamoud, and Sadiq Hassan–Bey conferred and "it was decided that we would formulate an arrest team. And we would go inside the mosque and use the security force as the arresting officers, and the Metropolitan Police officers would assist them...."

Before taking any police action, Lieutenant Parker testified, he took a megaphone to the courtyard area of the Center and informed those who were there to pray in that area that the services would be concluded until the situation was under control: "I knew I had to get the people that were there praying legitimately, get

them to leave the Islamic Center before we could take any police action."

13. On cross-examination of Dr. Hamoud, the defense attempted to elicit evidence of a dispute between Dr. Hamoud and Hassan–Bey in an attempt to demonstrate that it was unclear who had lawful authority. According to Dr. Hamoud, he shouted at Hassan–Bey in the presence of appellants before the arrests were made. Apparently, Dr. Hamoud and Hassan–Bey disagreed about whether the private security forces should wait for police assistance before intervening.

14. Dr. Hamoud testified: "I then asked Sadiq Hassan–Bey to do the proper legal thing and to avoid arrest if possible and go in and ask the people to leave. He then went in with the bullhorn and read the Code and asked the people to leave."

15. A tape recording made by Officer Nelson of the warnings issued was played at trial. Although at trial the officer indicated on a diagram how close he was standing to Hassan–Bey when the warnings were issued, the record does not reflect what that distance actually was.

16. Dr. Hamoud testified that he asked the police to enter the Mosque "[b]ecause these people had disrupted the prayer and I had also been attacked. Especially, they disrupted the prayer

Most of the appellants who testified claimed that they never heard the warnings to leave the Mosque. Specifically, Appellant Asi testified that he "definitely" did not hear the announcement by Hassan–Bey; he attributed this to the fact that about sixty people were chanting the takbiraat at the time and that they were located a distance from the speaker. In addition, most of the appellants who testified claimed that they were operating under a belief that they had the right to remain in the Mosque because no one had the authority to interfere with a religious service.

Regarding their right to remain, appellant Asi explained:

> My belief was that the services ... the prayer services at the Islamic Center and the Islamic Center, itself, was a place of worship for all Muslims. And that no one, no group of people whatever their characterization might be, had the right to interfere in the religious services designated for this place of worship ... the Mosque or the Mosjid.

This belief was based on a "fatwa,"[17] which appellant Asi had obtained from the Al–Azhar University in Cairo, Egypt, and circulated and discussed with fellow Muslims in the community.[18] The fatwa stated:

> Once (a piece of) land is endowed for the purpose of constructing a mosque upon it, then it is not permissible for anyone to own that mosque nor to claim an ownership of the mosque. It remains in the ownership of God forever. No one—Muslim or non-Muslim—may ban anyone from praying within the mosque. And no individual, organization or group may

exercise control of admission for prayers in it, nor may restrict prayers.

The jury found appellants guilty of unlawful entry.

## II.

In appealing their convictions of unlawful entry, appellants first contend that their prosecutions violated the Free Exercise and Establishment Clauses of the First Amendment. Second, they maintain that because they had the lawful authority to remain in the Mosque, the government failed to meet its burden of proof to sustain the unlawful entry convictions. Third, they assert that even if the elements of unlawful entry were proven beyond a reasonable doubt, their convictions cannot be upheld because they had a bona fide belief in their right to remain in the Mosque.

### A.

■ Appellants' Free Exercise Clause and Establishment Clause argument is based on the proposition that the invocation of the unlawful entry statute was an impermissible government intrusion upon resolution of a religious controversy. Specifically, they maintain that in order to reach a guilty verdict the jury had to resolve several contentious principles of the Islamic religion such as whether anyone can "own" a mosque, whether anyone can prohibit Muslims from praying in a mosque, and what the proper method of selecting an Islamic Imam is.

The Supreme Court has recently addressed the interplay between state crimi-

---

and there was a great disturbance going on inside." Officer McCready testified as to the arrest procedure: in each instance, the private security officer approached the person and the police officers assisted by placing a flexi-cuff on the person's hand, and a picture was taken of each arrestee at the back of the room with either Hassan–Bey or one of the security guards.

17. According to appellant Asi, "fatwas are considered the cornerstone ... the opinionating quarters of the Muslim world. In other words, if there were an equivalent in Islam to a Vatican ... that would be it." Asi testified that he secured the opinion after the closure of the Center on March 5, 1983, in order to determine

whether they could properly be prohibited from entering the Mosque. He also stated that the opinion was published in English translation in a newspaper distributed in the Muslim community.

18. The fatwa addressed four inquiries regarding exclusion from a mosque: (1) whether it was legally permissible to own a mosque; (2) whether it was legally permissible for the builders of a mosque to claim ownership of it; (3) whether Islamic law permitted non-Muslims to prohibit Muslims from performing prayer in a mosque; and (4) whether it was legally proper for any party to prohibit anyone it chooses from entering a mosque.

nal laws and the exercise of religion. In *Employment Division Department of Human Resources v. Smith (Smith II)*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), the Court considered whether an Oregon criminal statute prohibiting the religious use of the drug peyote violated the Free Exercise Clause. In concluding that it did not, the Court rejected the argument that the religious motivation underlying the defendants' conduct placed them beyond the reach of a criminal law that was not specifically aimed at religion and was admittedly constitutional as applied to others. *Id.* 494 U.S. at 876–77, 110 S.Ct. at 1599. Noting the distinction between regulation of religious beliefs and religious practices, the Court quoted from an earlier decision:

> "Laws are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices.... Can a man excuse his practices to the contrary because of his religious belief? To permit this would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself."

*Id.* at 879, 110 S.Ct. at 1600 (quoting *Reynolds v. United States*, 98 U.S. 145, 166–67, 25 L.Ed. 244 (1879) (holding criminal laws against polygamy constitutional as applied to Mormons whose religion commanded the practice)). The Court stated further that where a state enacts a neutral, generally applicable criminal law, it need not necessarily provide for religious exemptions, explaining, quoting again, that:

> To make an individual's obligation to obey such a law contingent upon the law's coincidence with his religious beliefs, except where the State's interest is "compelling"—permitting him, by virtue of his beliefs, "to become a law unto himself," ... —contradicts both constitutional tradition and common sense.

*Smith II, supra*, 494 U.S. at 885, 110 S.Ct. at 1603 (quoting *Reynolds*, 98 U.S. at 167) (footnote omitted). To hold otherwise, the Court reasoned, would result in constitutionally mandated religious exemptions from civic duties ranging from compulsory military service to health and safety regulation in the form of manslaughter and child neglect laws. *Smith II, supra*, 494 U.S. at 888–89, 110 S.Ct. at 1605–06.

Like the criminal law in *Smith II*, the District's unlawful entry statute is a neutral and generally applicable law. It is not directly aimed at religious practice. As invoked here, the unlawful entry statute was used to quell a disturbance, not a religious service. Thus, it was used to regulate conduct, not beliefs, a goal vindicated by the Supreme Court in both *Smith II* and *Reynolds*. The Free Exercise Clause cannot be used as a means to escape civic duties. *Smith II, supra*, 494 U.S. at 888–89, 110 S.Ct. at 1605–06.

Moreover, this court has rejected the same contention made by appellants in a case involving similar facts. In *Riley v. District of Columbia*, 283 A.2d 819, 821 (1971), *cert. denied*, 405 U.S. 1066, 92 S.Ct. 1499, 31 L.Ed.2d 796 (1972), the police arrested several Catholic activists for disrupting a Catholic mass by handing out leaflets during the offertory. In upholding their convictions under D.C.Code § 22–1114 (disturbing religious congregation), the court rejected the argument that the convictions constituted an impermissible intrusion into a religious dispute over a purely theological matter. The court noted that:

> The trial court did not attempt to decide an ecclesiastical question nor to enforce religious conformity, as appellants would have us believe. It did not receive the testimony as to the customs and usages of Blessed Sacrament Church in order to interpret canon law or liturgical practice but solely as an aid in determining whether or not appellants had violated a criminal statute.

*Id.* at 824–25.

Similarly, in the instant case, the jury was not required to resolve any religious issues of contention in order to determine whether appellants had violated the unlawful entry statute. The government and the defense did introduce evidence relating to the Imam controversy and whether Muslim law permits a Mosque to be privately

owned. But, this evidence, as in *Riley*, was not offered to interpret and resolve the nuances of the theological debate. Rather, the evidence was relevant to determining whether appellants were guilty of unlawful entry or had a sufficient defense to that charge. *See infra* Part II B & C. Nor was the jury put in the position of enforcing religious conformity; it was simply presented with evidence relating to the elements of unlawful entry, including a deed to the property, evidence of a disturbance, and evidence of defenses, and asked to determine whether a crime had occurred, not to choose sides. Therefore, appellants' contention that invocation of the unlawful entry statute violated the Free Exercise Clause fails.

### B.

■ Appellants also contend that the government's evidence was insufficient to prove beyond a reasonable doubt that appellants did not have lawful authority to remain in the Mosque after being asked to leave by officials of the Center.[19] We disagree.

In *Riley, supra*, 283 A.2d 819, the court acknowledged that the government's burden to show intent must not ignore customs and usages in a particular religious setting:

> We would agree that not every interruption of a religious service constitutes a violation of law. Certainly to justify the imposition of criminal sanctions for disturbing a religious meeting a person must have intentionally committed an act or acts which are found to have substantially disrupted the service. A conviction cannot be had for conduct which is order-

ly and within the known customs and usages governing the religious exercise or proceedings in the church. On the other hand, violence of conduct is not a prerequisite for conviction of disturbing a religious meeting.

*Id.* at 823. In that case the court concluded that there was sufficient evidence of guilt where the defendants had disobeyed the warning issued at the beginning of the mass by the pastor, acted contrary to the customs of the Church by handing out leaflets during the offertory, and caused the prayers to be interrupted and the mass stopped. *Id.* at 824.

■ Viewing the evidence, as we must, in the light most favorable to the government,[20] the testimony of Imam Al-Aseer described the order of the prayer and celebration that was to take place at the Mosque on July 11, 1983, and five government witnesses described the violent disturbance that occurred during the prayers instead. Indeed, even appellant Asi supported the conclusion that the conduct which occurred that day was not within the bounds of the customs of the Muslim religion when he testified that if a person came into the Mosque and caused a disturbance, "he could be requested to leave the Mosque, no doubt about it."

In addition, the government also introduced sufficient evidence of the legal elements of unlawful entry. *See United States v. Rothmeier*, 570 A.2d 811, 813 (D.C.1990); *O'Brien v. United States*, 444 A.2d 946, 948 (D.C.1982); *Leiss v. United States*, 364 A.2d 803, 806 (D.C.1976), *cert. denied*, 430 U.S. 970, 97 S.Ct. 1654, 52 L.Ed.2d 362 (1977).[21] The officials in

19. In order to convict appellants under the unlawful entry statute the government had the burden of proving that: (1) they were present at the mosque; (2) they were instructed to leave by the lawful occupant or person lawfully in charge of the mosque; (3) at the time they were instructed to leave, they did not have lawful authority to remain; and (4) upon being directed to leave the mosque, they refused to do so. *See* CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA No. 4.44(B) (3d ed. 1978).

20. When reviewing a claim of insufficiency of the evidence claim, the court must view the evidence in the light most favorable to the government. *In re T.M.*, 577 A.2d 1149, 1151 (D.C. 1990); *Hack v. United States*, 445 A.2d 634, 639 (D.C.1982) (quoting *Curley v. United States*, 81 U.S.App.D.C. 389, 392-93, 160 F.2d 229, 232-33, *cert. denied*, 331 U.S. 837, 67 S.Ct. 1511, 1512, 91 L.Ed. 1850 (1947)).

21. In *Leiss, supra*, 364 A.2d at 806, the court stated that the unlawful entry statute:

> prohibits the act of entering or remaining upon any property when such conduct is both without legal authority and against the expressed will of the person lawfully in charge

charge of security at the Mosque and the police described the circumstances under which appellants refused to leave the Mosque after a disturbance had disrupted the service and they had been asked to leave by the person with lawful authority to do so. The government offered sufficient evidence to show that Dr. Hamoud and Sadiq Hassan–Bey qualified as persons legally authorized to demand that those involved in the disturbance leave. Evidence relating to any disagreement between Dr. Hamoud and Sadiq Hassan–Bey about precisely when persons inside should be told to leave is irrelevant to the issue of whether appellants were ordered to leave by a person or persons with the legal authority to do so. *See Woll v. United States*, 570 A.2d 819, 821 (D.C.1990) (" 'a person may be lawfully in charge even though there are other persons who could, if they chose to do so, countermand or override his authority' ") (quoting *Whittlesey v. United States*, 221 A.2d 86, 89 (D.C.1966)).[22] In addition, *Woll, supra*, 570 A.2d at 822, makes clear that even a person without a possessory interest in the property can issue the order to leave, and consequently, there is no need to scrutinize precisely the limits of Dr. Hamoud's authority. The evidence showed that the Board of Governors vested Dr. Hamoud with considerable authority with respect to managing the daily affairs of the Center and maintaining security, and he was given the express authority to remove unauthorized persons from the Center and keep "troublemakers" out. Furthermore, in view of the fact that the Mosque is private property, as opposed to government property, "[t]he mere demand of the person

lawfully in charge to leave necessarily deprives the other party of any lawful authority to remain on the premises." *O'Brien, supra*, 444 A.2d at 948 (citing *Feldt v. Marriott Corp.*, 322 A.2d 913, 915–16 (1974)). *See also Byrne v. United States*, 578 A.2d 700, 702 (D.C.1990) (citing *O'Brien* for the same proposition). From the testimony of five government witnesses that they heard the warnings to leave given by Hassan–Bey, and a tape recording of the actual warnings that the jury itself heard, a reasonable jury could find that appellants did not have a right to remain thereafter in the Mosque.

■ Although appellants contend that a property, statutory, or constitutional right to remain on property precludes a conviction of unlawful entry, they fail to cite a single case in which such a claim was successfully advanced. Nor, as noted in Part II A, *supra*, can they prevail on the basis of their free exercise claim. Their argument that "the evidence failed to establish beyond a reasonable doubt that the Muslim appellants had no right to use of the property for the purpose of congregational prayer" misses the mark. Appellants were not arrested for praying in the Mosque. The government's evidence demonstrated that during the course of the celebration of the Eid a disturbance broke out. In fact, the government's evidence showed that after being asked to leave, appellants locked arms and continued to pray despite the violent disturbance that had disrupted the ceremony. A reasonable jury could have found that the disturbance involved violence,[23] and that appellants were arrested

of the premises. Thus, to be subject to the statute's sanctions, one must be without legal right to trespass upon the property in question.

**22.** In *Woll, supra*, 570 A.2d 819, the court addressed whether the owner of a clinic, a private leaseholder whose lease gave her the right to use a corridor, possessed the authority to have a police officer require abortion protestors to leave the corridor outside the clinic's office. Concluding that she had such authority, the court stated:

From this line of cases we can distill several principles: first, that more than one person can have the authority to order someone to

leave either public or private premises ...; second, that reasonableness is a factor in determining such authority ...; third, that someone lacking a possessory interest in the property (*e.g.*, the receptionist ...) may have such authority; and fourth, that the person in charge may act through an agent in ordering someone to leave....

*Id.* at 822 (citations omitted).

**23.** Of course, "violence of conduct is not a prerequisite for conviction of disturbing a religious meeting." *Riley, supra*, 283 A.2d at 823; *Bowman v. United States*, 212 A.2d 610, 611 (D.C. 1965) (breach of peace not necessary for invocation of unlawful entry statute).

only when they failed to leave the scene of a disturbance after being asked to do so, precisely for the reason to bring order inside the Mosque so that the prelude could be given and the prayers could commence.

### C.

■ Appellants also contend that the government could not prove that they had the requisite intent to commit the crime of unlawful entry because they had a reasonable belief in their right to enter and remain in the Mosque. While a bona fide belief defense to the crime of unlawful entry does exist, appellants' contention, while not without some merit, is ultimately unpersuasive.

■ When a person enters a place with a good purpose and a bona fide belief in his or her right to enter, that person lacks the requisite criminal intent for unlawful entry. *Smith v. United States*, 281 A.2d 438, 439 (D.C.1971). A defendant is entitled to an instruction, where the existence of such a belief is "genuinely questionable," to the effect that the government must prove beyond a reasonable doubt that the defendant did not have a reasonable, good faith belief in his lawful authority to stay. *Id.* at 439; *see* CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 4.44 comment (3d ed.1978). However, "to warrant an instruction it is not sufficient that an accused merely claim a belief to the right to enter. A bona fide belief must have some justification—some reasonable basis." *Smith, supra*, 281 A.2d at 439. As elaborated in *Gaetano v. United States*, 406 A.2d 1291, 1294 (D.C.1979), the court stated:

> The clear rule of law ... is that a reasonable belief in an individual's right to remain on property not owned or possessed by that individual must be based in the *pure indicia of innocence*. There must be some evidence that, for example, the

individual had no reason to know that he was trespassing on the rights of others. Perhaps the individual could reasonably believe that he had title or a possessory interest in the land, or that the land was publicly owned. Perhaps he could believe that he was invited onto the land. The court further stated in *Morgan v. District of Columbia*, 476 A.2d 1128, 1133 (D.C.1984), that "the belief must be based on a reasonable mistake of fact, or on a reasonable mistake as to a non-penal property law which, if not a mistake, would justify remaining on the property.... General intent is not negated by a mistaken belief about the applicability of a penal law." In the instant case, the government presented sufficient evidence from which a reasonable jury could conclude that appellants' motivation did not rise to the level of a reasonable, good faith belief in lawful authority to remain in the Mosque after being asked to leave.

First, appellants based their defense on their reliance on the fatwa and the Koran, arguing that such reliance negated the criminal intent necessary for the crime of unlawful entry.[24] However, the government presented evidence to raise a reasonable question regarding whether appellants had a bona fide belief in their lawful, as opposed to religious, authority to remain in the Mosque. The jury could fairly have credited the testimony of the five government witnesses who stated that they heard the warnings issued by Hassan–Bey. Indeed, appellant Asi's own testimony undermines appellants' claim of a bona fide belief. Asi conceded during cross-examination that before he saw the deed to the property on which the Mosque is located, which identified the Islamic Center as the owners, he obtained the fatwa from the Al–Azhar University. When asked whether the deed affected his belief regarding the legal validity of the fatwa, Asi responded:

---

**24.** The two appellants aside from appellant Asi who did testify at trial also stated that they believed that no one could own or possess a Mosque and that no one had the right to order anyone out of a Mosque who was praying. Both testified that the basis of their belief was the Koran and the fatwa contained in the news-

letter. Another defense witness testified to the same belief and basis. In the absence of any evidence of the basis of the individual appellants' bona fide belief, we must treat the remaining appellants as having the same position as that advanced by the defense witnesses at trial.

[ASI]: It was certainly a consideration.... It's a deed of the Islamic Center and it's something that cannot be denied. And because of that we were trying to establish relations with the Board of Governors who are the owners, the legitimate people who are responsible for that deed and because they were obdurate in their approach of the administration of the Islamic Center....

[THE PROSECUTOR]: So prior to July 11, 1983, did you understand that the property on which you entered was owned by the Board of Governors, isn't that true, sir?

[ASI]: Yes. That is true.

■ The touchstone of the bona fide belief defense is the belief in lawful authority to stay, not moral or religious authority.[25] *Reynolds, supra,* 98 U.S. at 166–67 (to hold otherwise would "make the professed doctrines of religious belief superior to the law of the land, and in effect ... permit every citizen to become a law unto himself [or herself]"). Yet each defense witness who was asked the basis of his belief that he could not be ejected from the Mosque cited the Koran and the fatwa. Furthermore, by acknowledging that the Board of Governors constituted the "true" owner of the Center in the eyes of the law, appellant Asi undercut appellants' claim of a bona fide belief in their lawful authority to stay.

Second, appellants could not prevail simply by reciting their belief in the fatwa and Koran since *Gaetano* makes clear that they had to demonstrate that the belief in their lawful right to stay was reasonable and based in the "pure indicia of innocence." *Gaetano, supra,* 406 A.2d at 1294. Evidence of awareness of a request to leave will defeat a bona fide belief claim. *See*

*Smith, supra,* 281 A.2d at 440 (defendant not entitled to a bona fide belief instruction where he acknowledged that he knew intrusion was unwarranted by testifying that gate of property on which he trespassed was kept locked to keep people from going through); *Jackson v. United States,* 357 A.2d 409, 411 (D.C.1976) (where girlfriend had ordered defendant to leave her apartment, "any grounds for a bona fide belief in his right to remain lapsed"). At trial, government witnesses testified that they were able to hear the warnings to persons inside the Mosque given by Hassan–Bey. Although appellants testified that they did not hear the warnings, this was an issue well within the jury's province to resolve. *See Irick v. United States,* 565 A.2d 26, 30 (D.C.1989) (citing *Stack v. United States,* 519 A.2d 147, 159–60 (1986)). In addition, appellant Asi acknowledged on two occasions the validity of requesting a person who disturbs a service to leave the Mosque:

[THE PROSECUTOR]: Now Mr. Asi, if someone came in the Mosque and caused a disturbance in the Mosque, could that person be requested to leave the mosque?

[ASI]: Of course if he created a disturbance he could be requested to leave the mosque, no doubt about it.

\* \* \* \* \* \*

[THE PROSECUTOR]: Is it your belief, sir, that a group of people who prevented Dr. Aseer from conducting the service at the Islamic Center could then be requested to leave the Mosque?

[ASI]: My belief is that if anyone disrupted a religious service of the Imam of the Muslim congregation in Washington, D.C. should be requested to leave the Mosque.

---

**25.** *See Boertje v. United States,* 569 A.2d 586, 591 (D.C.1989) (defendant's claim that justified under "divine" law to remain kneeling at White House not a valid defense to unlawful entry); *Gaetano, supra,* 406 A.2d at 1294 ("The 'bona fide belief' defense was not meant to, and does not, exonerate individuals who believe they have a right ... to violate the law in order to effect a moral, social, or political purpose, regardless of the genuineness of the belief or the popularity of the purpose"); *Hemmati v. United States,* 564 A.2d 739, 745 (D.C.1989) (no defense to unlawful entry that crime was committed "out of a sincere personal or political belief, however genuine, in the rightness of one's actions"). *See also United States v. Dougherty,* 154 U.S.App.D.C. 76, 473 F.2d 1113, (1972) (upholding jury instruction that it is no defense to unlawful entry that person acted from sincere religious motives or believed conduct justified by a higher authority) (cited approvingly in *Gaetano, supra,* 406 A.2d at 1294, and *Hemmati, supra,* 564 A.2d at 745).

Combined with his testimony acknowledging the "true" owners of the Center, appellant Asi's testimony cast doubt on the reasonableness of the belief of appellants in their lawful right to remain.

■ Finally, appellants do not suggest that their reasonable belief was rooted in either a reasonable mistake of fact or a reasonable mistake of non-penal property law. *See Morgan, supra,* 476 A.2d at 1133. Their reliance on the fatwa does not operate as a mistake of fact, nor does it represent a form of property law. Consequently, appellants' bona fide belief claim ultimately fails.

### III.

■ Appellants also contend that the trial judge committed prejudicial error by replacing a regular juror with an alternate juror in the absence of any factual support or legally relevant reason. For evidence of actual prejudice they rely on a signed statement of the dismissed juror indicating a disposition toward the defense and her post-trial testimony about extrajudicial conversations with the courtroom clerk about court employment. We find no abuse of discretion.

The dismissal arose as a result of events that began during a recess in defense counsel's closing argument. Juror McKeython sent a note to the trial judge stating that she was scheduled to leave on a prepaid, nonrefundable trip the next morning. The judge summoned her to the courtroom to discuss the matter, with both the government and the defense present. When defense counsel objected to dismissal of the juror, the trial judge instructed each of the parties to contribute twenty dollars in order to reimburse her. The next morning, after the juror had already missed her trip, the prosecutor retracted his willingness to reimburse the juror and requested that the juror be removed and replaced with an alternate. The prosecutor advised the judge that it was the opinion of his office that any such compensation or reimburse-

ment would be improper as well as inequitable with regard to the other jurors who might also be incurring expenses. Defense counsel objected to dismissal and stated that the defense would be willing to provide the entire forty dollars in an unmarked envelope. The prosecutor expressed concern that the juror would still know the source of the money.

The trial judge granted the government's request for removal of the regular juror and substitution of an alternate, stating that the reimbursement idea was "impermissible." The judge took the defense motion for a mistrial under advisement and denied the defense request for further interrogation of the juror for the record, concluding that "this situation entirely speaks for itself." In their motion for a new trial, appellants submitted the signed statement from the excused juror expressing her willingness to continue serving at the time she was dismissed, her ability to remain impartial, and her belief that she had not seen evidence that convinced her of appellants' guilt beyond a reasonable doubt. The trial judge denied the motion by order of July 31, 1984, stating that the juror's impartiality had in fact been impaired and that her removal and replacement with an alternate did not prejudice appellants.

■ Superior Court Criminal Rule 24(c) provides that alternate jurors shall replace regular jurors who are found to be "unable or disqualified to perform their duties" prior to deliberation. The decision of whether to replace regular jurors is within the discretion of the trial judge, and will only be reversed where there has been an abuse of discretion.[26] *Richbow v. District of Columbia,* 600 A.2d 1063, 1064–65 n. 1 (1991); *Golsun v. United States,* 592 A.2d 1054, 1057 (D.C.1991). *See United States v. Smith,* 918 F.2d 1501, 1512, 1525 (11th Cir.1990) ("We review the exercise of this discretion to ensure that the district court did not discharge the juror 'without factual support, or for a legally irrelevant rea-

---

**26.** The trial court is accorded substantial deference on this issue as a result of its superior ability to observe the demeanor of the juror and its familiarity with the proceedings. *Golsun, supra,* 592 A.2d at 1058; *District of Columbia v. Anderson,* 597 A.2d 1295, 1301 (D.C.1991).

son;' " defendant must show prejudice) (quoting *United States v. Farjardo*, 787 F.2d 1523, 1525 (11th Cir.1986)), *cert. denied*, —— U.S. ——, 112 S.Ct. 151, 116 L.Ed.2d 117 (1991); *United States v. Rodriguez*, 573 F.2d 330, 332 (5th Cir.1978).[27] The record reflects that the trial judge's decision to dismiss juror McKeython was "within the range of permissible alternatives" in the exercise of his discretion. *See generally Johnson v. United States*, 398 A.2d 354, 365 (D.C.1978).

Although the juror indicated her willingness to serve on the jury without compensation for the trip, as the government brief states, "the damage had been done." Even if, despite missing her trip, there was no danger that the juror would be distracted and agitated, the judge could reasonably conclude that the discussion about reimbursement in the juror's presence tainted her ability to remain impartial. Some explanation would be required as to why the reimbursement was not forthcoming. The trial judge recognized that "once that had been known that she would be reimbursed, to disclose to a witness that one side or the other had filched on the deal, if there was a deal … would have been something that we couldn't have permitted, because that certainly would have had some impact on her thinking." Defense counsel's willingness to pay all or half of the reimbursement, coupled with the prosecutor's objection to the propriety of such an arrangement created the possibility of juror bias. Moreover, the failure to receive any reimbursement, after hearing that she would receive it, might have soured the juror on the entire trial.

Finally, even if the judge might have inquired further of the juror, appellants have failed to demonstrate that they suffered prejudice as a result of the trial judge's decision to substitute the alternate juror. The observation by the United States Court of Appeals for the Tenth Circuit *Anderson v. Dun & Bradstreet, Inc.*, 543 F.2d 732, 734 (10th Cir.1976), is to the point:

> Appellants did object to the dismissal of the juror and the trial judge noted concern at the time about excusing a juror satisfactory to appellants…. But appellants have failed to show that any prejudice resulted from this incident. Further, the substituted juror was accepted by appellants when seated as an alternate. A party to a lawsuit has no vested right to any particular juror; the right of challenge is the right to exclude incompetent jurors, not to include particular persons who may be competent.[28]

Because the trial judge did not abuse his discretion and the claim of prejudice arising from extrajudicial contacts with the courtroom clerk is meritless, *see infra* Part IV, we hold that the dismissal of the regular juror was not reversible error.

## IV.

Finally, appellants contend that trial judge erred in denying their motion for a new trial on the ground that the courtroom clerk had intentionally displayed significant partiality toward the government during the reception of evidence at trial and had

---

**27.** This court has recognized that decisions interpreting the federal rule on replacement of jurors are relevant because our local rules are "closely modeled on the structure and substance of the Federal Rules of Criminal Procedure." *Bulls v. United States*, 490 A.2d 197, 200 n. 11 (D.C.1985) (citation omitted); *Leeper v. United States*, 579 A.2d 695, 697 (D.C.1990).

**28.** *See also United States v. Rodriguez*, 459 F.2d 983, 984 (9th Cir.) ("A litigant has no vested right to keep a particular juror on the panel, and the trial judge has broad discretion in excusing veniremen whom he has reason to believe may not be able to give both sides a fair trial"), *cert. denied*, 409 U.S. 865, 93 S.Ct. 158, 34 L.Ed.2d 113 (1972); *Mason v. Texaco*, 741

F.Supp. 1472, 1503 (D.Kan.1990) ("Defendant's theory is based on nothing more than a visceral hunch that was 'for them,' and that his dismissal resulted in the loss of a valuable defense ally…. But even assuming the validity of this entirely speculative assumption, defendant's argument is premised on the notion that it has a constitutional right to at least one partisan on the jury, and that the unavoidable dismissal of its partisan solely for legitimate and necessary medical reasons deprived it of a hung jury…. Fortunately a more earnest allegation of error is necessary before concerns of a constitutional magnitude are implicated"), *aff'd*, 948 F.2d 1546 (10th Cir.1991).

extrajudicial contacts of unknown substance with several jurors and a series of conversations with one juror about her attempts to secure employment with the court.

On three occasions during the trial, defense counsel expressed concerns to the trial judge about the conduct of the courtroom clerk. Defense counsel complained that the courtroom clerk was laughing and thus compromising his impartiality. At one point the judge admonished the clerk not to smile in front of the jury. Defense counsel also referred to improper contact between the clerk and the jurors during the trial.

■■■ After the jury returned the verdicts, appellants moved for a new trial based upon the extrajudicial contact between the clerk and the jurors. One of the jurors, Mary Thompson, the substituted alternate juror, testified at the post-trial hearing that during the trial she had initiated a conversation with the courtroom clerk about her interest in employment with the court, and the clerk had directed her to the vacancy bulletin board in the personnel office. Thereafter the clerk had inquired about her job search. Ms. Thompson testified that she and other jurors also exchanged pleasantries with the courtroom clerk in the hallway during the trial, explaining that they said, "hello and back and forth, yes ... speaking when we see him. That's it. We didn't have any what you say conversation and whatnot." She testified that the clerk had never informed her that he was not supposed to speak with jurors, although, in the early part of the trial, a marshal had told the jurors that the trial judge did not want the jurors to have much contact with any court employees.

Appellant Phram Nahidian testified that he was sitting in an assigned seat during the trial and had an unobstructed view of the jury and the courtroom clerk. He testi-

fied that the during the testimony of the government witnesses, the courtroom clerk was attentive, but his facial appearance changed during defense cross-examination to show his displeasure with the questions that defense counsel was asking. Thus, the clerk was attentive during the direct testimony of Hassan–Bey, but during the cross-examination the clerk's face was "completely grim, and ... unhappiness and displeasure was seen on his attitude." Also, when appellant Asi was testifying, the clerk grinned, looked at the witness with "a fierceful face," and while facing the jury the clerk had a clear look of unhappiness on his face; his body moved as though he were laughing and his head was moving from left to right. In addition, the clerk had put his finger on his forehead, giving a bad sign, rather than being impartial. In Nahidian's view, the clerk's behavior indicated that he thought Asi's testimony was a disgrace. Appellant Nahidian complained to defense counsel, advising that appellants were objecting to the conduct of the clerk. He also testified that the jurors were paying a lot of attention to the courtroom clerk's attitude. Out of the presence of the jury, he heard the clerk yell at defense counsel that in this courtroom there were two judges.[29]

Appellant Asi testified that he, too, was sitting in an assigned seat with an unobstructed view of the clerk and the jury. He described the contrast in behavior by the courtroom clerk when the government's witnesses were testifying and when the defense witnesses were testifying. In addition to facial gestures, the clerk actually used the third finger of his hand to make an obscene gesture. Appellant Asi could not recall precisely when this had occurred, and although he could not be certain, he thought that the jury had been present.

Appellants' trial counsel made an extended proffer of his own testimony.[30] He stat-

---

**29.** Defense counsel proffered, after the trial judge sustained a government objection to a question, that appellant Nahidian would have testified that the courtroom clerk's conduct was in marked contrast to the substitute courtroom clerk who was present when the regular clerk was on vacation.

**30.** The trial judge had sustained a government objection to defense counsel testifying about his own observations of the courtroom clerk's conduct.

ed that he had been practicing law for thirty-four years and that this was the first time he would have testified against a courtroom clerk. He stated that he and the courtroom clerk had previously had cordial relations, but that the clerk had acted cruelly toward defense counsel in this case. Defense counsel attributed this to the clerk's "absolute hostility and hatred for my clients, for their religion or for the cause which they represent." Counsel referred to the clerk's increasing hostility toward appellants, citing examples, and his hostile attitude when witnesses were testifying. Counsel described the clerk's conduct during appellant Asi's testimony, when the clerk had laughed, thrown his pencil down in disgust, and rolled his eyes giving the impression of absolute disbelief. Appellants had complained to counsel about the clerk's conduct and had seen the clerk scream at defense counsel when counsel had asked the clerk to stop gesturing in the jury's presence. Counsel had reported the conduct and complaints to the trial judge, who promised to speak with the clerk and to keep the clerk from having any contact with the jurors. But, counsel proffered, it became clear that the judge had no control over the clerk, who continued to have contact with the jurors. Defense counsel asked the trial judge to isolate the clerk from the jury, and the judge had agreed to do so, with only the marshal having contact with the jury. Counsel also proffered that after the defense had objected on the grounds that none of the government witnesses had testified about any criminal conduct by appellants, the courtroom clerk had told him that a later government witness, Hassan–Bey, would connect up all of the evidence.[31] The government presented no witnesses.

In *Smith v. Phillips*, 455 U.S. 209, 215–17, 102 S.Ct. 940, 945–46, 71 L.Ed.2d 78 (1982), the Supreme Court stated that where there is an allegation of juror bias, a hearing should be conducted in order to determine whether the misconduct actually resulted in prejudice. *See Catlett v. United States*, 545 A.2d 1202, 1213 (D.C.1988), *cert. denied*, 488 U.S. 1017, 109 S.Ct. 814, 102 L.Ed.2d 803 (1989). Following such a hearing, our review is for abuse of discretion, with the trial judge's findings of fact underlying a determination about bias being entitled to "great deference." *Brooks v. United States*, 536 A.2d 1091, 1096 (D.C. 1988). *See also Leeper, supra* note 27, 579 A.2d at 698. This court has acknowledged that in *Smith v. Phillips, supra*, 455 U.S. 209, 102 S.Ct. 940, the Supreme Court appeared to recognize that a presumption of prejudice "might be appropriate in certain cases." *Brooks, supra*, 536 A.2d at 1096.[32] However, this is not such a case, and we find no abuse of discretion by the trial judge in concluding that there was no evidence of actual bias. *See Smith v. Phillips, supra*, 455 U.S. 209, 102 S.Ct. 940 (trial court should not impute prejudice where factual determination made of no actual prejudice when juror applied for job with prosecutor's office during course of trial).

The trial judge held an evidentiary hearing on the issue of extrajudicial contact between juror Thompson and the courtroom clerk, and the testimony at the hearing yielded ample evidence to rebut any presumption of harm which might have existed. Ms. Thompson testified that other than limited pleasantries she had discussions with the clerk on two occasions. The first time, she asked him how to go about applying for a court job. In response, he told her how to get to the personnel office. At some point after that, the clerk inquired whether she had found the personnel office and filled out an application. Aside from these two conversations, the only other contact that Ms. Thompson described was that the jurors and the clerk spoke togeth-

---

**31.** The defense had also intended to call Dr. Kahn, a surgeon at Howard University Hospital, who had been present at an earlier hearing, ready to testify, but was not present now.

**32.** In *Washington v. Washington Hospital Center*, 579 A.2d 177, 184–85 (D.C.1990), the court addressed the presumption in *Remmer v. United States*, 347 U.S. 227, 229, 74 S.Ct. 450, 451–52, 98 L.Ed. 654 (1954), and noted that, "although improper juror contact is presumptively harmful, ... a party claiming prejudice from such contact is not entitled to a mistrial without more."

er on a daily basis in a "hello and back and forth" manner.

Although communications by court officials with jurors about the merits of the case could be grounds for reversal, *see, e.g., Parker v. Gladden,* 385 U.S. 363, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966) (contacts between three jurors and alternate jury with court bailiff who expressed opinion about defendant's character and guilt and indicated that the Supreme Court would reverse an erroneous conviction), there is nothing to indicate that the nature of the contacts in the instant case were serious enough to be deemed prejudicial. None of the contacts involved the merits of appellants' trial. Rather, the daily contact between the jurors and the clerk amounted to nothing more than an innocuous exchange of pleasantries. *See Washington v. Washington Hospital Center, supra,* 579 A.2d at 185 (because extrajudicial conversation involving juror was "innocuous," no prejudice to defendant); *United States v. Brown,* 605 F.2d 389, 397 (8th Cir.1979) cert. denied, 444 U.S. 972, 100 S.Ct. 466, 62 L.Ed.2d 387 (mistrial not required because of conversation between marshal and juror involving juror's car being parked in improper place). Appellants' contention on appeal that the trial judge's inquiry should have been more searching in view of evidence that the clerk spoke with other jurors is unpersuasive given the facts that Ms. Thompson testified that only pleasantries were exchanged, that the marshal had advised the jury early in the trial to limit contacts with court employees, and that defense counsel had ample latitude in probing the issue at the evidentiary hearing. In fact, several times during the hearing the trial judge rejected the prosecutor's request to limit the inquiry, noting that the court had to let defense counsel "make a record." There is no evidence that defense counsel was denied an opportunity to question the other jurors or present them as witnesses at the hearing, much less that defense counsel asked the trial judge to inquire of other witnesses.[33]

■ The conduct of the courtroom clerk is far more troubling. Like the bailiff in *Parker v. Gladden, supra,* 385 U.S. 363, 87 S.Ct. 468, a courtroom clerk is also an officer of the court and "beyond question carried great weight with a jury...." *Id.* at 365, 87 S.Ct. at 470–71. The conduct described by witnesses at the post-trial hearing cannot be condoned in any manner. The trial judge recalled, in response to defense counsel's complaints, that during the trial he had told the clerk to stop smiling and had twice told him to stop talking with jurors. Defense counsel's proffer, which was undisputed by the government, paints a picture of unprofessional conduct that is demeaning to the court. While some of the objectionable conduct occurred outside the presence of the jury, it clearly contributed to an atmosphere of hostility at trial that is evident from the record.[34] The record also makes clear that the courtroom clerk did not follow the judge's orders not to talk to the jurors. Moreover, the government errs in stating in its brief that there was no evidence that the jury "could or did see" the court clerk's gesturing; appellant Nahidian testified that the jurors were noticing the clerk's conduct, and appellant Asi testified that he also believed the jurors had noticed the clerk's conduct.

The record makes clear, however, that defense counsel obtained the relief that he

---

33. Defense counsel presented the testimony of Ms. Thompson, appellants Asi and Nahidian, and made a proffer and supplemental proffer with regard to the defense observations at trial. At the end of the July 2, 1984, hearing, defense counsel indicated that the defense wished to call only one additional witness, Dr. Khan, who was not present at the time. Although the trial judge stated that he would be "glad to hear him," he declined to continue the hearing. Defense counsel did not press the matter further.

34. In addition to the hostility suggested by the courtroom clerk's manners during the trial, there was a hostile exchange between the courtroom clerk and defense counsel when the court was in recess. The hostility at trial was heightened, moreover, by the acrimony between the prosecutor and defense counsel, arising apparently, at least in part, from the prosecutor's repeated refusal to accept rulings of the judge, a circumstance which continued after trial and caused the trial judge to observe during a post-trial hearing that it took one hour and five minutes to hear five minutes of testimony.

sought from the trial judge to the extent that the defense asked the judge to instruct the clerk on his behavior and to isolate the clerk from the jurors. Even when defense counsel became aware that the clerk was not conducting himself in accordance with the judge's orders, the defense did not request any special action by the trial judge.[35] No curative instruction was requested. Nor was the judge asked to remove the clerk from his courtroom. While we do not intend to overemphasize the point, since defense counsel brought the concern about the courtroom clerk's conduct to the trial judge's attention on three separate occasions, the extent to which the defense did not pursue additional remedies at trial is some indication that the defense did not view the courtroom clerk's conduct as prejudicing the jury.[36] *Cf. Parks v. United States,* 451 A.2d 591, 613 (D.C. 1982), *cert. denied,* 461 U.S. 945, 103 S.Ct. 2123, 77 L.Ed.2d 1303 (1983). Of some significance, also, is the fact that the courtroom clerk was on vacation during a part of the trial and a substitute clerk conducted himself without incident, according to appellants. In addition, the dismissed juror's signed statement, filed in support of appellant's motion for a new trial, contains no indication that she was swayed against appellants by the courtroom clerk's conduct. Indeed, although defense counsel stated in a certificate of counsel attached to the juror's statement that counsel had discussed with her the courtroom clerk's contacts with the jury, her statement nonetheless contained no allegation of prejudice; rather, she claimed that she had not seen sufficient evidence of appellants' guilt. Also, there was nothing in the alternate juror's testimony to suggest that the clerk's unprofessional conduct had influenced her one way or the other. In addition, the judge instructed the jury that it was to decide the case based on the evidence admitted at trial, and that, albeit with regard to the prosecutor, the jury was to "[d]isregard any facial expressions, any audible sounds or any movements of the body that you see or hear at the bench." Under these circumstances, with appropriate deference accorded to the trial judge's view of the proceedings, we find no abuse of discretion in denying appellants' motion for a new trial. *See Johnson, supra,* 398 A.2d at 365; *supra* note 26.

Accordingly, we affirm the judgments of conviction.

**35.** At one point the trial judge admonished the clerk not to smile, and defense counsel found this sufficient at the time:

> [THE COURT]: Well if you're going to smile turn around and face me. I'll have to get you a mask. I must agree that there must be no showing by any court personnel including the judge that favors or doesn't favor anything concerning the testimony.
> [DEFENSE]: Thank you, Your Honor.
> [THE COURT]: Is that all right?
> [DEFENSE]: Yes sir.

**36.** While defense counsel pursued their concerns about the conduct of the courtroom clerk in chambers with the trial judge, and other remedies may have been sought at that time, there is nothing in the record on appeal to indicate that the defense sought additional remedies.